

FILED

FEB - 9 2009

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

BRANDON and
JENNIFER WALTERS,
husband and wife, on
behalf of themselves
and all others similarly
situated,

      Plaintiffs,

v.

NETFLIX, INC., a Delaware
corporation; WAL-MART STORES,
INC., a Delaware corporation; and
WALMART.COM USA, LLC,
a Delaware corporation.

CIVIL ACTION NO.: 2:09-0110

# 2 3415

## CLASS ACTION COMPLAINT

Plaintiffs Brandon and Jennifer Walters ("Plaintiffs"), husband and wife, by their

attorneys Bell & Bands, PLLC, bring this civil action on behalf of themselves and all others

similarly situated, against Defendants Netflix, Inc. ("Netflix"); Wal-Mart Stores, Inc. ("Wal-

Mart Stores"); and Walmart.com USA, LLC ("Walmart.com"), under the federal antitrust laws,

Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§1-2 and Sections 4 and 16 of

the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages, injunctive relief, and

the costs of suit, including reasonable attorneys' fees, for the injuries to Plaintiffs and

members of the proposed Class they represent resulting from Defendants' violations of the

federal antitrust laws.  The allegations set forth below are based upon personal knowledge

with respect to Plaintiffs' own acts and information and belief with respect to all other matters.

## NATURE OF CLAIMS

1.    This antitrust class action arises out of a conspiracy among Defendants Netflix, Wal-Mart Stores, and Walmart.com to divide the markets for the sales and online rentals of DVDs in the United States in order to avoid competition, and to monopolize and illegally restrain trade in at least the Online DVD Rental Market (defined *infra*).

2.    Defendants entered into an agreement to divide the markets for the sales and online rentals on DVDs in the United States ("Market Division Agreement") on or about May 19, 2005.

3.    Prior to the Market Division Agreement, Defendants competed in the Online DVD Rental Market.   Under the Market Division Agreement, Wal-Mart Stores and Walmart.com agreed to exit the Online DVD Rental Market in order to stop competing with Netflix and, in return, Netflix agreed not to enter into the new DVD sales market but instead promote the DVD sales of Wal-Mart Stores and Walmart.com.

4.    Netflix's agreement not to sell new DVDs was comparable and sufficient consideration for the agreement inasmuch as Netflix had the capacity and economic incentive to engage in both the Online DVD Rental Market as well as the new DVD sales market, thereby creating significant competition in the new DVD sales market for Wal-Mart Stores and Walmart.com, but by the terms of the agreement Netflix forbore its opportunity to enter the new DVD sales market.

5.    Defendants' Market Division Agreement effectively eliminated competition in the Online DVD Rental Market and enabled Netflix to charge its subscribers higher

2

subscription prices for the online rental of DVDs than it otherwise would have. As a result of Defendants' contract, combination of efforts, and conspiracy, as well as Netflix's unlawfully acquired and maintained market and monopoly power, Netflix actually did (and continues to) overcharge Plaintiffs, and millions of other consumers similarly situated, for the online rental of DVDs.

6.      Plaintiffs bring this class action on behalf of themselves and other similarly injured consumers in the United States who paid a subscription fee to rent DVDs from Netflix during the period May 19, 2005 to the present (hereinafter, the "Class Period"). At all relevant times, Defendants agreed, combined, and conspired with each other to monopolize, eliminate competition, and to restrain trade. As a result of Defendants' unlawful conduct and conspiracy, Plaintiffs and the other members of the Class paid artificially high subscription fees and have been damaged thereby.

## JURISDICTION AND VENUE

7.      Plaintiffs bring this action seeking federal injunctive relief, treble damages, and the costs of this litigation, including reasonable attorneys' fees, for injuries sustained by Plaintiffs and members of the Class as a result of Defendants' violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, as alleged in this complaint.

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a) and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

9.      Venue is proper in this judicial district pursuant to 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. § 1391(b) and (c) because during the Class Period at least one of the Defendants resided, transacted business, was found, or had agents in this district; and

because a substantial portion of the affected interstate trade and commerce described herein has been carried out in this district.

**PARTIES**

10.     Plaintiffs are individual consumers residing in South Charleston, Kanawha County, West Virginia.  During the Class Period, Plaintiffs subscribed directly to Netflix for their personal, noncommercial use and were injured by reason of the antitrust violations alleged herein.

11.     Defendant Netflix is a Delaware corporation headquartered at 100 Winchester Circle, Los Gatos, California, 95032.  Netflix rents DVDs directly to consumers nationwide through its website, www.netflix.com, by charging monthly subscription fees and offers various subscription plans.  Since starting its online DVD rental business in 1999, Netflix's total subscribers have grown at a compound annual rate of 70% reaching about 10 million in 2007.  Its annual revenues from engaging in interstate commerce exceeded $1.2 billion in 2007, which has more than doubled since 2004.  Netflix has possessed a market share of at least 75% of the Online DVD Rental Market in the United States, as defined herein, at all times during the Class Period.  Netflix is publicly traded on the NASDAQ under the symbol NFLX.

12.     Defendant Wal-Mart Stores is a Delaware corporation headquartered at 702 S.W. 8th Street, Bentonville, Arkansas, 72716.  Wal-Mart Stores is the largest retailer in the United States with revenues of approximately $400 billion annually.  Wal-Mart Stores is publicly traded on the New York Stock Exchange under the symbol WMT.  Through its retail stores and its website, www.walmart.com, Wal-Mart Stores sells DVDs directly to consumers nationwide.  Wal-Mart Stores sells far more DVDs than any other retailer in the United

4

States, accounting for about 40% of all new DVDs sold to consumers domestically.  Prior to the Market Division Agreement as specified herein, Walmart.com, a wholly-owned subsidiary of Wal-Mart Stores, was a major competitor of Netflix in the Online DVD Rental Market through the "Walmart DVD Rentals" service, which was available on www.walmart.com.

13.    Defendant Walmart.com is a wholly-owned subsidiary of Wal-Mart Stores. Walmart.com is a Delaware company with its headquarters at 7000 Marina Boulevard, Brisbane, California, 94005.  It is the online component of Defendant Wal-Mart Stores.  Prior to the conspiracy alleged herein, Defendant Walmart.com competed with Defendant Netflix in the Online DVD Rental Market through the "Walmart DVD Rentals" service.  While its financials are not publicly reported by Wal-Mart Stores, Walmart.com is ranked as the 14th largest online retailer in the United States. Through the website, www.walmart.com, Walmart.com sold and continues to sell DVDs directly to consumers nationwide.  Consumers who purchase DVDs via www.walmart.com may have them either mailed or otherwise delivered to them directly, or they may be picked up at a Wal-Mart Stores retail location via Walmart.com and Wal-Mart Stores' "Site to Store" program.

14.    Walmart.com and Wal-Mart Stores are fully integrated, operate as a single commercial enterprise, and hold themselves out to the public as one entity.  Walmart.com is an internet sales channel for Wal-Mart Stores; it is not operated as an independent business entity.  Wal-Mart Stores is the registrant of the www.walmart.com domain name that is used to sell products and services by Walmart.com.  Likewise, Wal-Mart Stores is the registrant of www.walmartdvdrentals.com.  Wal-Mart Stores' Chief Marketing Officer John Fleming has explained the relationship between Wal-Mart Stores and Walmart.com as follows: "Wal-Mart Stores set up Walmart.com as a separate company with some outside investors, but within

5

six months Wal-Mart Stores bought back the outside interest and Walmart.com; Walmart.com now serves as a 'marketing channel' for Wal-Mart Stores."

15.    Any reference in this complaint made to an act, deed, or transaction of any corporation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business affairs.

## CLASS ACTION ALLEGATIONS

16.    Plaintiffs bring this action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, on their own behalf and on behalf of all others similarly situated.  The "Class" is defined as:

> Any person in the United States that paid a subscription fee to Netflix to rent DVDs at any time from at least May 19, 2005 to the present.  The Class specifically excludes: Defendants; their officers, directors, or employees; their subsidiaries, affiliates, or any other entity over which they have a controlling interest; any co-conspirators; and any affiliate, legal representative, heir, or assign of any Defendant.  Also excluded are: any federal, state, or local government entities; any judicial officer presiding over this action and the members of his/her immediate family and judicial staff; and any juror assigned to this action.

17.    The members of the Class are so numerous and geographically dispersed across the country that joinder of all members of the Class would be impracticable.  Due to the nature of the claims asserted here, Plaintiffs believe that members of the Class are located throughout the United States.  The exact number of Class members is unknown to Plaintiffs at this time, but Plaintiffs believe that the Class is in the thousands and their

identities can only be discovered through inspection of Defendants' records, which are or should be readily available.

18.    Plaintiffs are members of the Class.   Plaintiffs' claims are typical of the members of the Class because Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants alleged herein.   Plaintiffs and the Class paid a subscription fee to Netflix directly, which was artificially maintained at non-competitive prices established by the actions of Defendants in connection with the wrongful conduct alleged herein.

19.    Plaintiffs will fairly and adequately protect the interests of the Class.   The interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class.   In addition, Plaintiffs are represented by counsel who is experienced and competent in the prosecution of complex class action antitrust litigation.

20.    Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members, if any, in that Defendants have acted on grounds generally applicable to the entire Class.   Among the questions of law and fact common to the Class are:

   a.    Whether Defendants engaged in a contract, combination, or conspiracy to allocate markets;

   b.    Whether Defendants unreasonably restrained trade in the Online DVD Rental Market;

   c.    Whether Defendants intended for Netflix to monopolize the Online DVD Rental Market;

   d.    The nature and character of the acts performed by Defendants in the furtherance of the alleged contract, combination, or conspiracy;

   e.    Whether the alleged contract, combination, and conspiracy violated Section 1 of the Sherman Act;

    f.       Whether the alleged contract, combination, and conspiracy violated Section 2 of the Sherman Act;

    g.      Whether Defendants have acted or refused to act on grounds generally applicable to the Class;

    h.      Whether Defendants' conduct caused Netflix subscription fees to be higher than they otherwise would have been and thereby caused injury to the Plaintiffs and other members of the Class; and

    i.       The appropriate measure of damages sustained by Plaintiffs and other members of the Class.

21.    Class action treatment is superior to the alternatives, if any, for the fair and efficient adjudication of the controversy alleged herein. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single form simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by certain class members who could not afford to individually litigate an antitrust claim against large corporation defendants.

22.    The Class is readily definable and is one for which records likely exist in the files of Defendants.

23.    Plaintiffs are not aware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

### INTERSTATE TRADE AND COMMERCE

24.    The trade and commerce relevant to this action are the sales and rentals of DVDs in the United States.

25.    During the Class Period, Plaintiffs and members of the Class throughout the United States purchased and/or rented DVDs directly from Defendants.

8

26.    Defendants' conduct has taken place within the flow of, and substantially affected the interstate commerce of the United States. Specifically, during the Class Period, Defendants have sold and/or rented DVDs throughout the United States, involving hundreds of millions or billions of dollars in interstate commerce, and used the instrumentalities of interstate commerce, including interstate wires and the U. S. mail, to sell and/or to rent DVDs throughout the United States.

## THE ONLINE DVD RENTAL MARKET

27.    "DVD", as defined herein, refers to a Digital Video Disc or Blu-ray Disc containing commercially recorded entertainment programs for personal viewing. DVDs are the primary medium by which movies and other recorded entertainment are distributed in the United States. Revenues on DVDs far exceed those generated from box office receipts. In addition, DVDs have become a particularly lucrative means for the distribution of previously aired television programs, surpassing even television syndication rights as a revenue stream in many instances. As defined herein, "DVD" does not refer to blank Digital Video Discs, which are used to store or record data.

28.    While Defendants' market allocation is *per* se illegal and requires no market definition, for any claims that may require a market definition the relevant market is the market for the rental of DVDs online by subscription for delivery by mail ("Online DVD Rental Market").

29.    In the Online DVD Rental Market consumers pay a monthly subscription fee to an online service provider, such as Netflix, Blockbuster Online, or (prior to May 19, 2005) Walmart DVD Rentals, in order to rent DVDs. There are no late fees or due dates, but, within any given plan, the consumer pays the subscription fee regardless of how many DVDs he or

she rents per month.  Thus, even a consumer who does not rent a DVD for months still is charged the subscription fee; Netflix CEO Reed Hastings calls this the "gym membership effect."

30.    To rent DVDs, consumers go to the provider's website and list the DVDs they wish to rent in the order of preference in an online rental "queue".  Online DVD rental providers have expansive arrays of DVDs for consumers to choose from.  The library of titles available from online service providers has grown over time, now ranging near 100,000 DVDs, often twenty to one-hundred times the selection of titles stocked at any single video rental store.

31.    When a DVD is available, it is sent via U. S. mail to the consumer's home. Consumers return the DVD to the provider via U. S. mail in a prepaid envelope and then receive the next DVD in their queue.

32.    The Online DVD Rental Market is distinct from the traditional in-store DVD rental market and the two services are not reasonably interchangeable.  In traditional in-store DVD rental, consumers must drive to the store, hope the DVD they want is in stock, pay for the DVD on a per DVD basis, and return the DVD within the allocated time frame or incur late fees.  During the Class Period as alleged herein, these late fees have accounted for as much as 20% of the revenues in the traditional in-store DVD rental market; in contrast, there are no late fees or due dates in the Online DVD Rental Market.

33.    Other factors differentiating the Online DVD Rental Market from other forms of DVD rental, such as in-store, kiosk, or video downloading, include:

　　　　a.    Pricing. In the Online DVD Rental Market, consumers generally pay a monthly subscription, which is independent from the number of DVDs the consumers actually rents in a month.  In

10

contrast, in other forms of DVD rentals, the consumer usually pays for each individual DVD rental.  Consequently, changes in the price of online rentals do not closely track changes in the price of in-store or other forms of rental.   Furthermore, the pricing of online rentals is generally nationwide in scope and is not affected by local in-store prices and competition.  As a result, the pricing of online rentals would generally be the same to a consumer, regardless of whether the nearest rental store is two minutes or two hours away.

b.    <u>Online DVD Rental Offers Additional Services.</u>   Online DVD rental providers generally offer additional services, such as movie reviews, customer-specific recommendations based on viewing and preference history, and other metrics of popularity.

c.    <u>Online DVD Rental is Functionally Unique.</u>   Online rentals fundamentally differ from in-store rentals in that: (1) they do not require travel to a store, (2) are available to anyone with a postal address, regardless of proximity to a store, (3) are primarily subscription-based services, and (4) provide a much wider selection of titles than cant a traditional rental store. Online DVD rental may be preferred to kiosk rental or downloading for a number of reasons, including relative selection and convenience for consumers, pricing, as well as, from the supply perspective, licensing considerations and technological limitations.

11

     d.    Market Recognition. The online rental market is recognized as a distinct market by the public and the industry, including by Defendants. For instance, recently a Netflix executive told the *Wall Street Journal* that other types of rental services, such as kiosk and in-store rentals, do not present a direct competitive threat to Netflix. That same executive acknowledged that, while video downloads may be a competitive force in the future, DVD will be the dominant medium for years to come, making the entry of this technology not timely enough to be considered a competitive force in the Online DVD Rental Market. Netflix CEO Reed Hastings has observed that the competitive threat of internet downloading to online DVD rental during the Class Period is like that of hydrogen powered cars to gasoline powered cares — inconsequential for many years to come. He has further explained that DVDs will be the dominant medium for movies for perhaps as long as the gasoline engine.

34.    The Online DVD Rental Market is also distinct from the market for DVD sales. The pricing of DVDs for retail sale and online DVD rentals is very different. Factors differentiating the Online DVD Rental Market from the new DVD sales market include:

     a.    Pricing. As discussed above, consumers who subscribe to online DVD rental services generally pay a monthly subscription fee. This fee does not vary based on whether the consumer is renting popular or obscure DVDs. In contrast, the price of DVDs

for sale is heavily based on how popular the DVD is, including whether it is a new release or how successful the title originally was at the box office or on television.

b. <u>Market Recognition.</u>  The industry and the public perceive the Online DVD Rental Market as a separate and distinct market from the new DVD sales market.

c. <u>Different Purposes.</u> The factors motivating a consumer to buy a DVD are different from those that lead a consumer to rent a DVD.  Consumers generally rent DVDs when they intend to view the DVD once; consumers buy a DVD when they intend to watch it multiple times.  DVD rentals are also of no use to consumers that want to give a DVD as a gift or wish to collect DVDs.

d. <u>Distinguishing Characteristics.</u>  DVDs sold at retail have other distinguishing characteristics, such as packaging and special features, not available with rentals.  Online rentals are sent in plain envelopes that contain little information other than the title of the DVD.  Moreover, whether a DVD is new or used is not an issue in rental, but it is a significant factor in sales.  Used DVDs are sold at a significant discount to their new counterparts because they are relatively less desirable to consumers.

35.    Because the Online DVD Rental Market is distinct from the markets for other forms of rental or sales, there is little cross-elasticity of demand between these products

and therefore significant non-transitory increases in price do not cause consumers to switch from one market to another.

36.     The geographic market for the Online DVD Rental Market is the United States. The practical reality is that, among other things, shipping costs and trans-global differences in DVD data encoding make it neither practical nor feasible for entities located in other countries to rent DVDs to U. S. consumers.

37.     Netflix dominated the Online DVD Rental Market at all times relevant to this complaint. Netflix's approximate market share of the Online DVD Rental Market is 75%, making it the clear market leader. As a result of this market share, Netflix has had, and continues to have, market and monopoly power in the Online DVD Rental Market. It has the power to control prices or exclude competition in this market.

38.     Since the implementation of the Market Division Agreement, discussed in detail *infra*, the Online DVD Rental Market has been overwhelmingly comprised of only two firms: Netflix and Blockbuster Online. Netflix controls approximately 75% of the Online DVD Rental Market; Blockbuster Online possesses nearly all of the remaining 25% of the market. A few minor firms have shares of less than 1-2% of the market. During fiscal years 2005-2007 combined, Netflix earned nearly $4 billion in revenues and $1.3 billion in gross profit from renting DVDs to consumers — a margin of more than 33%.

39.     There have been no significant market entrants in the more than three years since the announcement of the Market Division Agreement, which increased those barriers. Online DVD rental is highly capital intensive. A firm must operate on a large scale to be successful. It requires the possession of a significant number of shipping facilities strategically located throughout the United States to ensure timely delivery. It also requires stocking an extensive inventory of DVDs to maintain the selection of titles that consumers

14

demand. As Netflix CEO Reed Hastings has observed, "When you think about the barriers to entry to this business, it is subtle because it appears easy. A kid can open a website. But the barriers to profitability are very large."

40,   Wal-Mart Stores and its wholly-owned subsidiary Walmart.com dominate the new DVD sales market. Together they hold an industry-leading 40% of the domestic DVD sales market. During fiscal years 2005-2008 combined, they earned revenues in excess of $25 billion by selling DVDs to consumers. Both Wal-Mart Stores and Walmart.com benefit from the Market Division Agreement.

## ANTICOMPETITIVE CONDUCT

41.   Competition in the Online DVD Rental Market was heating up in 2004-2005. The market was composed of three major competitors — Netflix, Blockbuster Online, and Walmart DVD Rentals.  With increasing competition from new competitor Blockbuster Online, Netflix stock prices dropped precipitously.

42.   In mid-2004, Netflix was charging $21.99 for its most popular subscription rental plan. When Blockbuster Online entered the Online DVD Market in August of 2004 it was charging $19.99 for a comparable plan; however, by November Blockbuster Online had reduced its price to $17.49. Walmart DVD Rentals followed suit and reduced the price on its comparable plan from $18.86 to $17.36. Faced with increasing competition, soon thereafter, Netflix reduced its prices by nearly 20% to $17.99 per month.

43.   The price wars continued and Blockbuster Online further decreased its price to $14.99. This was 20% below Netflix's already reduced price and more than 40% below the price Netflix was charging just months earlier. Not to be under-priced, Walmart DVD Rentals reduced its price to $12.97 on January 7, 2005. As prices decreased, so did profits.

44.     At the same time competition was increasing in the Online DVD Rental Market, competition was also increasing in the new DVD sales market.  Defendants Wal-Mart Stores and its wholly-owned subsidiary Walmart.com, which had established themselves as the leader in new DVD sales, were facing increasing competition from in-store and online channels of distribution in new DVD sales, including competition from Amazon.com.

45.     While not yet in the new DVD sales market, Netflix posed a serious threat to Wal-Mart Stores and Walmart.com if it entered the new DVD sales market.  Netflix had a subscriber base of millions of consumers who were known in the industry to be prolific DVD buyers, and the sales and profits of Wal-Mart Stores and Walmart.com stood to suffer if Netflix began selling new DVDs to these consumers.  If, however, Wal-Mart Stores and Walmart.com were able to persuade Netflix subscribers to buy their DVDs from Wal-Mart, then Wal-Mart Stores and Walmart.com stood to gain market share, as well as, additional sales and profits.

46.     Defendants were well-aware that competition in both the Online DVD Rental Market and new DVD sales market was not good for them.  Netflix Chairman and CEO Reed Hastings took action.  Faced with increasing competition and decreasing profits, Hastings invited Walmart.com's CEO John Fleming to dinner to discuss their companies' DVD sales and rental businesses.

47.     Fleming, who reported directly to Walmart Stores' CEO Lee Scott, accepted the invitation; the two met in January 2005.  At the same time of this meeting, Netflix and Walmart.com were direct competitors — both competed in the online DVD rental business and Netflix had the potential to compete directly with Walmart.com and Wal-Mart stores in the DVD sales business.

16

48.     This meeting marked the beginning of Defendants' conspiracy to reduce competition in both markets.  Defendants' contract, combination of efforts, and conspiracy was ultimately reflected in their Market Division Agreement.

49.     On May 5, 2005, in Netflix's First Quarter earnings call with financial analysts, held after the January dinner, but only two weeks prior to the public announcement of the Market Division Agreement, Hastings made plain the motive for Netflix to conspire with Wal-Mart Stores and Walmart.com:

> In terms of profitability over the coming years, the key issue is the number of major competitors.  If there are only two major players, Blockbuster and Netflix, the profitability may be substantial like other two-firm entertainment markets.  If, on the other hand, Amazon, Wal-Mart, Blockbuster and Netflix are all major competitors in online rental, then the profits would likely be small.

Hastings went on to "predict" on that conference call:

> [T]he likely case is [that] online rental becomes a two-firm market over the years.

50.     On May 19, 2005, shortly after Fleming had been promoted to Chief Marketing Officer of Wal-Mart Stores, Defendants issued a joint press release that revealed the existence of the Market Division Agreement, by which they unlawfully divided and allocated the markets for DVD sales and rentals, and did, in fact, create the two-firm market that Hastings "predicted".

51.     Under Defendants' Market Division Agreement, Wal-Mart Stores and Walmart.com agreed to exit the Online DVD Rental Market in order to stop competing with Netflix and, in return, Netflix agreed to not enter the new DVD sales market but instead promote the DVD sales of Wal-Mart Stores and Walmart.com.

52.    Both Wal-Mart Stores and Walmart.com are directly implicated in the illegal Market Division Agreement because, at the time of the announcement of the Market Division Agreement, Fleming was acting not only in his capacity as an executive responsible for overseeing Walmart.com, but also as the Chief Marketing Officer of Wal-Mart Stores. Furthermore, in a letter submitted to the court in a prior antitrust case brought against Netflix by other plaintiffs for other alleged violations of law, an assistant general counsel for Wal-Mart Stores, referring specifically to Wal-Mart Stores, wrote of "Wal-Mart's decision to discontinue renting DVDs." And it was Wal-Mart Stores, not Walmart.com., that issued the press release announcing the Market Division Agreement. In the press release, Wal-Mart Stores stated that Walmart.com's DVD sales are in fact Wal-Mart Stores' "online movie sales business," and that, more generally, Wal-Mart Stores' "[o]nline merchandise sales are available at www.walmart.com."

53.    Defendants' agreement did not go unnoticed. Several newspapers and other publications reported on the agreement. Titles of these articles sum up the public's reaction: "Wal-Mart and Netflix: An Alliance;" Wal-Mart and Netflix Scratch Each Other's Backs;" "Truce in DVD-Rental Wars;" "Wal-Mart Teams with Netflix;" and "Wal-Mart Loves Netflix: and Vice-Versa."

54.    Defendants subsequently followed through on their agreement. Beginning on May 19, 2005, Walmart.com, exited the online rental business and encouraged its subscribers to transfer to Netflix. Walmart.com prominently placed a link to the Netflix website on its website encouraging Walmart.com subscribers to transfer their subscriptions to Netflix. Defendants' event offered Walmart.com subscribers the opportunity to lock in this current lower Walmart.com subscription rates for up to one year if they transferred their

18

subscriptions to Netflix.  Netflix, in return, encouraged its subscribers to buy their DVD's from Wal-Mart Stores and Walmart.com both online and in mailers sent to its subscribers.

55.    Since the date of their joint announcement on May 19, 2005 (apart from the 30 days that Walmart.com used to wind down its existing online rental business) neither Walmart.com nor Wal-Mart Stores has participated in the Online DVD Rental Market, nor has Netflix entered the new DVD sales market.

56.    Defendant's Market Division Agreement eliminated Walmart.com from the Online DVD Rental Market thereby eliminating Walmart.com's downward pricing pressure and creating a two-competitor market.  Absent the Market Division Agreement, Netflix would have had to lower its prices no later than May 19, 2005.  However with competition reduced, both Blockbuster Online and Netflix quickly increased their prices.

57.    In July 2005, Blockbuster Online raised its subscription price from $14.99 to $17.99 per month, mating Netflix's price.  And, in Netflix's next earnings call, on August 8, 2005, Hastings boasted:

> Last quarter we said online rental was shaping up to be a two-
> player market, and that is indeed what is happening.

58.    Defendants would not have entered into their Market Division Agreement absent an illegal, anticompetitive agreement not to compete.  The agreement was not in the independent self-interest of Wal-Mart Stores, Walmart.com, or Netflix.  For instance, absent an agreement from Netflix to avoid competing with Wal-Mart on new DVD sales, neither Wal-Mart Stores nor Walmart.com would have wanted Walmart.com to withdraw from the Online DVD Rental Market, encourage it subscribers to be transferred to Netflix, or promote Netflix's rental business. Likewise, absent an agreement from Wal-Mart Stores and Waalmart.com to exit the Online DVD Rental Market, Netflix would had no incentive to

forebear its opportunities to enter the new DVD sales market as Netflix's millions of subscribers purchased on average twenty-five (25) DVDs per year each, a substantial market opportunity.

### ANTITRUST INJURY TO PLAINTIFF AND THE CLASS

59.    Defendants' illegal, anticompetitive Market Division Agreement has had the following effects.  Among other effects, it has:

    a.    eliminated one of only three significant competitors in the Online DVD Rental Market;

    b.    eliminated competition between Defendants;

    c.    enabled Netflix to acquire market and monopoly power in the Online DVD Rental Market; and

    d.    enabled Netflix to implement monopolistic and supra-competitive pricing in the Online DVDE Rental Market.

60.    During the Class Period, Plaintiffs and the Class paid supracompetitive prices for monthly subscription fees to Netflix.  By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have been injured, having paid higher prices for their Netflix monthly subscriptions than they would have paid in the absence of the illegal contract, combination, or conspiracy.

61.    The specific amounts of damages have not yet been determined because such determination will require discovery.

**COUNT I**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**
**Illegal Market Allocation Among All Defendants**

62.     Plaintiffs and members of the Class incorporate by reference the allegations above and re-allege each as though fully set forth herein.

63.     Defendants have entered into a *per se* illegal market division agreement, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C §1. Even if evaluated under the Rule of Reason, the Market Division Agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. §1.

64.     Prior to and at the time of the agreement, Netflix and Walmart.com were actual competitors in the Online DVD Rental Market. In addition, Netflix, Wal-Mart Stores, and Walmart.com were potential competitors in the new DVD sales market. Wal-Mart Stores and Walmart.com were actual participants in the new DVD sales market and Netflix was a potential participant with the means and economic incentive to sell new DVDs – in the absence of the Market Division Agreement.

65.     Defendants entered into and engaged in a contract, combination of efforts, or conspiracy, beginning at least as early as May 19, 2005, designed to achieve the unlawful objective of dividing the markets for online DVD rentals and new DVD sales. The Market Division Agreement allocated the Online DVD Rental Market to Netflix, with Wal-Mart Stores and Walmart.com agreeing not to compete in the Online DVD Rental Market. The agreement also allocated new DVD sales to Wal-Mart Stores and Walmart.com, with Netflix agreeing to refrain from selling new DVDs and therefore agreeing not to compete with Wal-Mart Stores or Walmart.com in the new DVD sales market. In addition to explicitly or *de facto* agreeing not to sell new DVDs, Netflix also obtained the Market Division Agreement by

21

providing potentially valuable promotion to Wal-Mart Stores and Walmart.com. In so doing, Netflix provided significant consideration to Wal-mart Stores and Walmart.com for their agreement that Walmart.com would withdraw from, and both Walmart.com and Wal-Mart Stores would not compete in, the Online DVD Rental Market.

66.     The Market Division Agreement has created significant anticompetitive effects and no pro-competitive benefits. It eliminated competition in the Online DVD Rental Market, raising prices paid by consumers. To the extent that there are any pro-competitive benefits at all resulting from the agreement, they would not outweigh the agreement's anticompetitive effects. In any event, to the extent that there were any pro-competitive benefits, they could have been achieved by less restrictive means.

67.     As a proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have sustained damages, in an amount presently not known, by paying supracompetitive prices for Netflix subscriptions that they would not have had to incur but for the unlawful conduct of Defendants as alleged herein.

## COUNT II

### VIOLATION OF SECTION 2 OF THE SHERMAN ACT
### Conspiracy to Monopolize the Online DVD Rental Market by All Defendants

68.     Plaintiffs and members of the Class incorporate by reference the allegations above and re-allege each as though fully set forth herein.

69.     Defendants consciously entered into and engaged in a contract, combination, or conspiracy, beginning at least as early as May 19, 2005, to monopolize the Online DVD Rental Market.

70.     Prior to and at the time of the agreement, Netflix and Walmart.com were actual competitors in the Online DVD Rental Market. Defendants conspired with the specific

intent, knowledge, and purpose that their anticompetitive agreement would result in Netflix willfully acquiring and maintaining a monopoly in the Online DVD Rental Market.  Wal-Mart Stores and Walmart.com knew that the natural and probable consequence of the Market Division Agreement would be the monopolization of the Online DVD Rental Market by Netflix. To effectuate their contract, combination, or conspiracy, Defendants did those things they combined or conspired to do, including:  entering into, complying with, and implementing the Market Division Agreement, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

71.    As a proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have sustained damages, in an amount presently no known, by paying supracompetitive prices for Netflix subscriptions that they would have not had to incur but for the unlawful conduct of Defendants as alleged herein.

**COUNT III**

**VIOLATION OF SECTION 2 OF THE SHERMAN ACT**
**Netflix's Monopolization of the Online DVD Rental Market**

72.    Plaintiffs and members of the Class incorporate by reference the allegations above and re-allege each as though fully set forth herein.

73.    Netflix has monopoly power in the Online DVD Rental Market.

74.    Netflix willfully acquired and maintained its monopoly in the Online DVD Rental Market by its acts and practices described herein, including by executing, implementing, and otherwise complying with the Market Division Agreement, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

75.    As a proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have sustained damages, in an amount presently not known, by paying

23

supracompetitive prices for Netflix subscriptions that they would not have had to incur but for unlawful conduct of Defendants as alleged herein.

## COUNT IV

### VIOLATION OF SECTION 2 OF THE SHERMAN ACT
### Netflix's Attempt to Monopolize the Online DVD Rental Market

76.     Plaintiffs and members of the Class incorporate by reference the allegations above and re-allege each as though fully set forth herein.

77.     If Netflix does not already have monopoly power, then Netflix has a dangerous probability of success in achieving monopoly power in the Online DVD Rental Market.

78.     With the specific intent to achieve monopoly, Netflix, by its acts and practices described herein, including by executing, implementing, and otherwise complying with the Market Division Agreement, has attempted to monopolize the Online DVD Rental Market, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2.

79.     As a proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have sustained damages, in an amount presently not known, by paying supra competitive prices for Netflix subscriptions that they would not had had to incur but for the unlawful conduct of Defendants as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that:

A.     The Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiffs be appointed class representatives, and that Plaintiffs' counsel be appointed as counsel for the Class;

B.     The unlawful combination and conspiracy alleged herein be adjudged and decreed to be an unreasonable restraint of trade in violation of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. § 1-2;

C.     The Court declare the Market Division Agreement between Defendants announced May 19, 2005, to be unlawful and null and void;

D.     Plaintiffs and the Class recover compensatory damages, as provided by law, determined to have been sustained by each of them, and that joint and several judgments in favor of Plaintiffs and the Class, respectively, be entered against Defendants, in an amount to be trebled in accordance with antitrust laws, and each of them;

E.     Plaintiffs and the Class recover their costs of this suit, including reasonable attorneys' fees, expert fees, and accountants' fees, as provided by law;

F.     Plaintiffs and the class be awarded pre-judgment and post-judgment interest at the highest legal rate to the extent provided by law;

G.     Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from, in any manner, continuing, maintaining, or renewing the contract, combination, or conspiracy alleged herein, or from engaging in any other contract, combination, or conspiracy having similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect, pursuant to Section 16 of the Clayton Antitrust Act of 1914, 15 U.S.C. § 29; and

H.     Plaintiffs and the Class be granted such additional relief as the nature of the case may require or as may seem just and proper to this Court.

## JURY DEMAND

Pursuant to Federal Rules of Civil Procedure 38(b) and otherwise, Plaintiffs respectfully demand a trial by jury.

**BRANDON AND JENNIFER WALTERS,
and all others similarly situated,**

**by counsel**

 s/Harry F. Bell, Jr.
Harry F. Bell, Jr., Esquire
William L. Bands, Jr., Esquire
**BELL & BANDS PLLC**
P. O. Box 1723
Charleston, West Virginia 25326-1723
304-345-1700
304-344-1956   Facsimile
hfbell@belllaw.com
wlbands@belllaw.com